MAIL ORDER ASSOCIATION
OF AMERICA, Petitioner,

v.

UNITED STATES POSTAL
SERVICE, Respondent,

McGraw–Hill, Inc.; Newspaper Association of America; Magazine Publishers of America, Inc.; TVSM; Third Class Mail Association; New York State Consumer Protection Board; Coalition of Religious Press Associations; United Parcel Service; Dow Jones & Company, Inc.; American Business Press; Alliance of NonProfit Mailers; Nashua Corporation and District Photo, Inc.; ADVO, Inc.; Time Warner, Inc.; Major Mailers Association; Shorter–Run Printers Committee; Association of Alternate Postal Systems; Parcel Shippers Association; Reader's Digest Association, Inc.; National Newspaper Association, Intervenors.

DIRECT MARKETING ASSOCIATION,
INC., Petitioner,

v.

UNITED STATES POSTAL
SERVICE, Respondent,

United Parcel Service; Dow Jones & Company, Inc.; American Business Press; Alliance of NonProfit Mailers; Nashua Corporation and District Photo, Inc.; Time Warner, Inc.; ADVO, Inc., Intervenors.

NIAGARA TELEPHONE COMPANY,
Petitioner,

v.

UNITED STATES POSTAL
SERVICE, Respondent,

United Parcel Service; Dow Jones & Company, Inc.; American Business Press; Alliance of NonProfit Mailers; Nashua Corporation and District Photo, Inc.; Time Warner, Inc.; ADVO, Inc., Intervenors.

ALLIANCE OF NonPROFIT
MAILERS, Petitioner,

v.

UNITED STATES POSTAL
SERVICE, Respondent,

United Parcel Service; Dow Jones & Company, Inc.; American Business Press; Nashua Corporation and District Photo, Inc.; ADVO, Inc.; Time Warner, Inc., Intervenors.

GOVERNORS OF the UNITED STATES
POSTAL SERVICE, Petitioners,

v.

POSTAL RATE COMMISSION,
Respondent,

Dow Jones & Company, Inc.; United Parcel Service; Brooklyn Union Gas Company; American Business Press; Alliance of NonProfit Mailers; American Bankers Association; Nashua Corporation and District Photo, Inc.; Time Warner, Inc.; ADVO, Inc., Intervenors.

THIRD CLASS MAIL ASSOCIATION,
Petitioner,

v.

UNITED STATES POSTAL
SERVICE, Respondent,

United Parcel Service; Dow Jones & Company, Inc.; American Business Press; Alliance of NonProfit Mailers; Nashua Corporation and District Photo, Inc.; Time Warner, Inc.; ADVO, Inc., Intervenors.

DOW JONES & COMPANY,
INC., Petitioner,

v.

UNITED STATES POSTAL
SERVICE, Respondent,

United Parcel Service; American Business Press; Alliance of NonProfit Mailers; Nashua Corporation and District Photo, Inc.; Time Warner, Inc.; ADVO, Inc., Intervenors.

ADVO, INC., Petitioner,

v.

UNITED STATES POSTAL
SERVICE, Respondent,

United Parcel Service; Dow Jones & Company, Inc.; American Business Press; Alliance of NonProfit Mailers; Nashua Corporation and District Photo, Inc.; Time Warner, Inc., Intervenors.

TIME WARNER, INC., Petitioner,

v.

UNITED STATES POSTAL SERVICE, Respondent,

United Parcel Service; Dow Jones & Company, Inc.; American Business Press; Alliance of NonProfit Mailers; Nashua Corporation and District Photo, Inc.; ADVO, Inc., Intervenors.

Nos. 91–1058, 91–1059, 91–1063, 91–1065, 91–1073 to 91–1075, 91–1079 and 91–1080.

United States Court of Appeals, District of Columbia Circuit.

Argued May 19, 1993.

Decided July 16, 1993.

As Amended Aug. 24, 1993.

As Amended on Denial of Rehearing Sept. 22, 1993.

See also 986 F.2d 509.

Daniel J. Foucheaux, Jr., Attorney, U.S. Postal Service, argued the cause for Governors of the U.S. Postal Service, petitioners in No. 91–1073. With him on brief were Eric P. Koetting and John L. DeWeerdt, Attorneys, U.S. Postal Service.

David E. McGiffert argued the cause for Mail Order Ass'n of America, Advertising Mail Marketing Ass'n, Third Class Mail Ass'n, Direct Marketing Ass'n, Inc. and ADVO, Inc., petitioners in Nos. 91–1058, 91–1059, 91–1074 and 91–1079 and intervenors in Nos. 91–1063, 91–1065, 91–1073, 91–1075 and 91–1080. With him on brief were David C. Todd, for Mail Order Ass'n of America, Ian Volner and N. Frank Wiggins, for Advertising Mail Marketing Ass'n and Third Class Mail Ass'n, Dana T. Ackerly, for Direct Marketing Ass'n, Inc. and John M. Burzio and Thomas W. McLaughlin for ADVO, Inc.

David M. Levy argued the cause for Alliance of NonProfit Mailers, petitioner in No. 91–1065 and intervenor in Nos. 91–1058, 91–1059, 91–1063, 91–1073, 91–1074, 91–1075, 91–1079 and 91–1080.

Michael F. McBride argued the cause for Dow Jones & Co., Inc. and Time Warner, Inc., petitioners in Nos. 91–1075 and 91–1080 and intervenors in Nos. 91–1058, 91–1059, 91–1063, 91–1065, 91–1073, 91–1074 and 91–1079. With him on brief were M. Reamy Ancarrow and George L. Mahoney for Dow Jones & Co. and John M. Burzio and Timothy L. Keegan for Time Warner, Inc.

Timothy E. Welch argued the cause for Niagara Telephone Co., petitioner in No. 91–1063. Dean George Hill entered an appearance for Niagara Telephone Co.

William B. Baker argued the cause for Newspaper Ass'n of America and Ass'n of Alternate Postal Systems, intervenors in No. 91–1058. With him on brief were John R.

Sturm for Newspaper Ass'n of America and David R. Straus for Ass'n of Alternate Postal Systems.

Richard Littell argued the cause for Major Mailers Ass'n, intervenor in No. 91–1058.

Stephen L. Sharfman argued the cause for Postal Rate Com'n, respondent in 91–1073.

Daniel J. Foucheaux, Jr., Attorney, U.S. Postal Service, argued the cause for U.S. Postal Service, respondent in Nos. 91–1058, 91–1059, 91–1063, 91–1065, 91–1074, 91–1075, 91–1079 and 91–1080. With him on brief were Eric P. Koetting and Scott L. Reiter, Attorneys, U.S. Postal Service.

Jacob M. Lewis, Attorney, U.S. Dept. of Justice, argued the cause for U.S. Postal Service, respondent in Nos. 91–1058, 91–1059, 91–1063, 91–1065, 91–1073, 91–1074, 91–1075, 91–1079 and 91–1080. With him on brief were Stuart M. Gerson, Asst. Atty. Gen., Patricia M. Bryan, Deputy Asst. Atty. Gen., and Anthony J. Steinmeyer and Jonathan R. Siegel, Attorneys, U.S. Dept. of Justice.

On brief for American Business Press, Shorter–Run Printers Committee, McGraw-Hill, Inc. and Coalition of Religious Press Associations, intervenors in Nos. 91–1058, 91–1059, 91–1063, 91–1065, 91–1075 and 91–1080, were David R. Straus, Stephen M. Feldman, Robert A. Saltzstein and Matthew F. Lintner for American Business Press and Shorter–Run Printers Committee and Ann J. LaFrance and David Alan Nall for McGraw-Hill, Inc. and Coalition of Religious Press Associations. Robert J. Brinkman entered an appearance for Nat. Newspaper Ass'n. Dr. John Stapert entered an appearance for Coalition of Religious Press Associations.

On brief for Brooklyn Union Gas Co. and American Bankers Ass'n, intervenors in No. 91–1073, were Michael W. Hall, Roderick D. Strickland and Kenneth T. Maloney for Brooklyn Union Gas Co. and John J. Gill and Irving D. Warden for American Bankers Ass'n.

On brief for New York State Consumer Protection Bd., intervenor in No. 91–1073, were Richard M. Kessell, Joel Blau and Philip S. Shapiro.

Robert L. Kendall, Jr. entered an appearance for United Parcel Service, intervenor in Nos. 91–1058, 91–1059, 91–1063, 91–1065, 91–1073, 91–1074, 91–1075, 91–1079 and 91–1080.

William J. Olson and John S. Miles entered appearances for Nashua Corp. and Dist. Photo, Inc., intervenors in Nos. 91–1058, 91–1059, 91–1063, 91–1065, 91–1073, 91–1074, 91–1075, 91–1079 and 91–1080.

Timothy J. May entered an appearance for Parcel Shippers Ass'n and Reader's Digest Ass'n, Inc., intervenors in No. 91–1058.

James R. Cregan entered an appearance for Magazine Publishers of America, Inc., intervenor in No. 91–1058.

Steven A. Levy entered an appearance for TVSM, intervenor in No. 91–1058.

Before WALD, WILLIAMS and HENDERSON, Circuit Judges.

Opinion for the Court filed Per Curiam.*

PER CURIAM.

## I. Introduction

Under the Postal Reorganization Act of 1970, 39 U.S.C. § 101 et seq. ("PRA" or "Act"), the Governors of the United States Postal Service ("USPS" or "Postal Service"), and the Postal Rate Commission ("PRC" or "Commission") each play a distinct and complementary role in the process of changing postal rates and classifications. This complex case involves challenges to several aspects of a postal ratemaking proceeding that began in March 1990. Before discussing each of these challenges, we briefly recount the Act's provisions for the determination and the review of postal rates, as well as the progression of the ratemaking proceeding that brought these issues to this court.

* Judge Wald authored Parts I and II and Judge Williams authored Parts IV, V, and VI.

## A. Respective Roles of the Postal Service, the PRC and the Court

### 1. Role of the Postal Service

■ The PRA provides that, "[e]xcept as otherwise provided, the Governors [of the Postal Service] are authorized to establish reasonable and equitable classes of mail and reasonable and equitable rates of postage and fees for postal services in accordance with the provisions of this chapter." 39 U.S.C. § 3621. The Postal Service has the exclusive authority to initiate the ratemaking proceeding by requesting a recommended decision from the Commission. *Dow Jones v. USPS*, 656 F.2d 786 (D.C.Cir.1981). Section 3622(a) of the Act provides:

From time to time, the Postal Service shall request the Postal Rate Commission to submit a recommended decision on changes in a rate or rates of postage or in a fee or fees for postal services if the Postal Service determines that such changes would be in the public interest and in accordance with the policies of this title. The Postal Service may submit such suggestions for rate adjustments as it deems suitable.

39 U.S.C. § 3622(a). The Postal Service has generally followed a pattern of filing omnibus rate cases every three years. U.S. Postal Rate Commission Postal Rate and Fee Changes 1990, Opinion and Recommended Decision at V–48 [hereinafter "PRC Op."]. The Postal Service may also "from time to time request that the Commission submit . . . a recommended decision on changes in the mail classification schedule." 39 U.S.C. § 3623(b).

Once the Commission has issued its recommended decision, the Governors may respond to it in one of the following ways: they may approve the recommended decision and order it placed in effect; they may allow the recommended decision to take effect under protest and seek judicial review of it; they may allow the recommended decision to take effect under protest and return it to the Commission for further consideration; or they may reject the recommended decision and resubmit it to the Commission for further consideration. *Id.* § 3625(b), (c) & (d). If the Governors seek further consideration, they may treat the Commission's further recommended decision as if it were the initial decision, exercising one of the above options, or, under certain circumstances, they may, with the unanimous written concurrence of all of the Governors, modify the recommended decision. *Id.* § 3625(d). The Board of Governors, which includes the Postmaster General and the Deputy Postmaster General, as well as the Governors, *id.* § 202, determines the effective date for any new rates, fees or classifications. *Id.* § 3625(f).

### 2. Role of the Postal Rate Commission

■ The Postal Rate Commission, as its name suggests, is also an active and independent participant in postal ratemaking. *Id.* § 3601. Its primary duty is to make recommendations to the Governors with respect to postal rates, fees and classifications. *Id.* §§ 3622(b), 3623 & 3624. When the Commission receives a request for a recommended decision from the Governors, the statute instructs it to consider the request "promptly," *id.* § 3624(a), issuing its recommended decision generally within ten months, *id.* § 3624(c)(1). Before issuing a decision, however, the Commission is to conduct a record hearing under sections 556 and 557 of the Administrative Procedure Act ("APA"). 5 U.S.C. §§ 556 & 557. The hearing must give users of the mails, the Postal Service, and an officer of the Commission who represents the interest of the general public an opportunity to be heard. 39 U.S.C. § 3624(a). The record of such hearings must provide the basis for the Commission's recommended decision. *See Newsweek, Inc. v. USPS*, 663 F.2d 1186, 1205 (2d Cir.1981) (remanding a PRC recommended decision that was based on a methodology that was not introduced in the hearings or subjected to cross-examination or discovery), *aff'd sub nom. National Ass'n of Greeting Card Pubs. v. USPS*, 462 U.S. 810, 103 S.Ct. 2717, 77 L.Ed.2d 195 (1983).

To achieve "the utmost expedition consistent with procedural fairness to the parties," the Commission is authorized to adopt rules to provide for:

(1) the advance submission of written direct testimony;

(2) the conduct of prehearing conferences to define issues, and for other purposes to insure orderly and expeditious proceedings;

(3) discovery both from the Postal Service and the parties to the proceedings;

(4) limitation of testimony; and

(5) the conduct of the entire proceedings off the record with the consent of the parties.

39 U.S.C. § 3624(b).

The factors the PRC must consider in making its recommended decision are:

(1) the establishment and maintenance of a fair and equitable schedule;

(2) the value of the mail service actually provided each class or type of mail service to both the sender and the recipient, including but not limited to the collection, mode of transportation, and priority of delivery;

(3) the requirement that each class of mail or type of mail service bear the direct and indirect postal costs attributable to that class or type plus that portion of all other costs of the Postal Service reasonably assignable to such class or type;

(4) the effect of rate increases upon the general public, business mail users, and enterprises in the private sector of the economy engaged in the delivery of mail matter other than letters;

(5) the available alternative means of sending and receiving letters and other mail matter at reasonable costs;

(6) the degree of preparation of mail for delivery into the postal system performed by the mailer and its effect upon reducing costs to the Postal Service;

(7) simplicity of structure for the entire schedule and simple, identifiable relationships between the rates or fees charged

the various classes of mail for postal services;

(8) the educational, cultural, scientific, and informational value to the recipient of such matter; and

(9) such other factors as the Commission deems appropriate.

39 U.S.C. § 3622(b). This court has noted that " '[t]he responsibilities of the Postal Rate Commission are strictly confined to relatively passive review of rate, classification, and major service changes, unadorned by the overlay of broad FCC-esque responsibility for industry guidance and of wide discretion in choosing the appropriate manner and means of pursuing its statutory objective.' " *Governors of the USPS v. PRC*, 654 F.2d 108, 117 (D.C.Cir.1981) (quoting *United Parcel Serv., Inc. v. USPS*, 455 F.Supp. 857, 873 (E.D.Pa.1978), *aff'd*, 604 F.2d 1370 (3d Cir. 1979), *cert. denied*, 446 U.S. 957, 100 S.Ct. 2929, 64 L.Ed.2d 815 (1980)) [hereinafter *Governors*]. In addition to responding to the Governors' request for recommended decisions on rates, fees or classifications, however, the Commission may, on its own initiative, recommend changes in mail classifications. 39 U.S.C. § 3623(b).

### 3. Role of the Court

The PRA provides that "[a] decision of the Governors to approve, allow under protest, or modify the recommended decision of the Postal Rate Commission may be appealed to any court of appeals ... within 15 days after its publication ... by an aggrieved party who appeared in the proceedings" before the Commission. *Id.* § 3628. The "aggrieved party" is generally a private party that uses the mails, but may also be the Governors of the Postal Service. *Id.* § 3625(c).

Judicial review is to be conducted in accordance with the APA and the Hobbs Act, 28 U.S.C. ch. 158,[1] "on the basis of the

---

1. The Hobbs Act governs judicial review of final orders of certain agencies. Two of its provisions are particularly relevant here. First, section 2347 provides that, when the agency has held a hearing, its order is reviewable "on the record of the pleadings, evidence adduced, and proceedings before the agency." 28 U.S.C. § 2347(a). Second, section 2348 provides that "[t]he agency, and any party in interest in the proceeding

before the agency whose interests will be affected if an order of the agency is not enjoined, set aside, or suspended, may appear as parties thereto of their own motion and as of right, and be represented by counsel in any proceeding to review that order." *Id.* § 2348. Earlier in this proceeding, we determined that, under this second provision, the Postal Service has some independent litigating authority to seek judicial re-

record before the Commission and the Governors." 39 U.S.C. § 3628; *see also Newsweek*, 663 F.2d at 1205. The court "may affirm the decision or order that the entire matter be returned for further consideration, but the court may not modify the decision. The court may not suspend the effectiveness of the changes, or otherwise prevent them from taking effect until final disposition of the suit by the court." 39 U.S.C. § 3628.

### B. The Progression of Docket R90–1

Each of the issues before us came out of a ratemaking proceeding known as Commission Docket R90–1. This proceeding began with the Postal Service's March 6, 1990 request to the Commission for a recommended decision on changes in postal rates, fees and classifications. After holding hearings on the requested changes, the Commission issued an opinion and recommended decision on January 4, 1991.

On January 22, 1991, the Governors responded with three separate decisions. In one, the Governors concluded that the rates and fees recommended by the Commission would not allow the Postal Service to break even in the 1991 fiscal year. They allowed under protest and sought Commission reconsideration and a further recommended decision as to several matters, including the attribution of city carrier costs, which is one of the issues in this consolidated docket. In a second decision, the Governors rejected eight recommended classification changes that had not been proposed by the Postal Service. In the third, they allowed the PRC's recommended Public's Automation Rate ("PAR") to take effect under protest and sought judicial review of it.

On May 24, 1991, the Commission, as required by statute, issued a further recommendation and decision as to the issues the Governors returned to it. The Governors rejected this recommendation and decision on July 1, 1991. A third Commission decision followed on October 3, 1991, but the Governors rejected that one as well on January 6, 1992. In this appeal, we consider

view of a PRC recommendation that it has allowed under protest. *See Mail Order Ass'n of*

challenges brought by private parties to several aspects of the rate orders issued by the Postal Service and one challenge by the Governors to a Commission recommended decision they allowed under protest.

### II. Public's Automation Rate

In its January 4, 1991 recommended decision, the Commission recommended a new discount for First Class Mail. This two-cent discount, known as the Public's Automation Rate, or PAR, would apply to individual or bulk First Class letters on which the sender had pre-printed the barcode for the destination's nine-digit ZIP code. The Postal Service's request for a recommended decision did not include the PAR category, and the Governors allowed it under protest and sought judicial review of it. The Postal Service, with the support of intervenor Readers Digest Association, urges us to reject the PAR category because it was not the subject of hearings and was therefore not supported by substantial evidence on the record. The Postal Service also argues that the PRC exceeded its statutory authority by incorporating into its recommendation a new category that was not part of the Postal Service request and that the Governors' proposed barcoding discount for bulk mail was not, as the PRC claimed, arbitrary and capricious. Because we conclude that the PRC's PAR recommendation was not based on substantial evidence on the record, we return it to the PRC for further consideration.

### A. Development of the PAR Proposal

The PRC deems its PAR category an "amalgam" of two proposed prebarcoding discounts that were discussed in its hearings. PRC Op. at V–71. The first, proposed by the Commission's Office of the Consumer Advocate (OCA), was the Courtesy Envelope Mail, or CEM, category, which encompassed only certain reply mail, such as the preprinted return envelopes enclosed in utility bills. The OCA proposed a three-cent discount for such reply letters that were automation-compatible, addressed to a post office box, and

*America v. U.S.P.S.,* 986 F.2d 509 (D.C.Cir.1993).

marked with a ZIP & 4 code and corresponding barcode. *Id.* at V–74. The Postal Service opposed the CEM proposal, as it had done in the previous ratemaking, claiming, among other things, that the OCA had exaggerated the automation acceptance rate for CEMs, since the mail is not uniform and is deposited in collection boxes, where it can become bent, and is thus less automation-compatible than bulk mail;[2] that the OCA's revenue analysis was flawed, greatly underestimating the losses that would result; and that it awarded the discount to the wrong group—the recipients of the CEMs—instead of the businesses that produced and mailed the envelopes, who should be entitled to the discount under recognized "worksharing" principles.[3]

The Postal Service offered its own First Class discount proposal, one that applied only to First Class bulk mail. It would grant a three-cent discount for prebarcoded, nonpresorted bulk letters, whether destined for a post office box or a street address, thereby extending the existing bulk prebarcoding discount to bulk mailers who do not sort their mail by ZIP codes.[4] Thus, the Governors focused on one unifying characteristic—that letters are processed and delivered for mailing in bulk—while the Commission focused on another—prebarcoding.

The Commission found both of these proposals wanting, primarily because they did not go far enough to "distribute[ ] across the spectrum of users, to consumers, small businesses, and major businesses alike ... the cost savings identified with [automation]." PRC Op. at V–80. It argued that it was unduly discriminatory and arbitrary and capricious to extend discounts to bulk mailers, but not individual mailers, who imprint their envelopes with destination barcodes that can be read by machines. *Id.* at V–54. Accordingly, it recommended its own, considerably broader PAR category, which encompasses every automation-compatible,[5] letter-sized piece of mail with the requisite barcode, including individual letters mailed from someone's home or a collection box and destined either for a post office box or a street address. *See id.* at V–51 (recommending discount for "*all* nonpresorted, prebarcoded, automation-compatible First–Class letters") (emphasis in original). Thus, unlike bulk mail, which the mailer delivers to a post office, or CEM mail, which is destined for a post office box, the PAR mail could entail both the cost of collection from a collection box and the cost of delivery to a street address. All qualifying letters would be entitled to a two-cent discount. In the absence of record testimony as to the anticipated volume of this non-CEM, nonbulk First Class mail, the PRC estimated that it would be about five percent of nonhousehold First Class mail. *Id.* at V–62–63.

2. In bulk mailings, letters or cards are sorted on trays by ZIP codes, with preprinted postage, and delivered to designated post offices or bulk mail acceptance facilities.

3. The PAR differed from existing First Class discounts in that it applied to individual letters deposited in collection boxes, and not exclusively to bulk mailings. These existing discounts are considered "worksharing" discounts, designed to pass through to the mail users the costs they save the Service by taking on aspects of processing or delivering their mail.

4. Two related proposals were also before the Commission. Brooklyn Union Gas Company and the American Bankers Association, which also supported the PRC's proposed PAR rate, separately proposed that the Commission eliminate its three-cent per piece fee for prebarcoded, automation-compatible Business Reply Mail (BRM) pieces. BRM, unlike CEM, does not use stamps, as its postage is preprinted. In its recommended decision, the Commission declined to eliminate the per piece fee, but noted that its PAR discount would "have the effect of providing [automation-compatible BRM] letters with a 2-cent pre-barcode discount from First–Class postage." PRC Op. at V–434.

Brooklyn Union also proposed that such BRM pieces mailed individually but *received* in bulk be entitled to the same three-cent discount that the Postal Service proposed for nonpresorted, prebarcoded letters *mailed* in bulk. The Commission rejected this proposal as well, in part because "many of the cost differences identified by Brooklyn Union are recognized, and given rate recognition, in the [PAR] discount we are recommending." *Id.* at V–436.

5. To be automation-compatible, letters have to be of a certain size and print quality and have to have a Facing Identification Mark, or "FIM," which consists of a number of vertical bars slightly to the left of the upper righthand corner. This FIM alerts automated facing/canceling equipment that the letter is barcoded, so that it can go directly to a barcode sorter (or BCS).

The Commission offered several justifications for its decision to expand prebarcoding discounts to nonbulk, non-CEM mail. It concluded that eliminating the bulk requirement would enlist consumer and small business assistance in the Postal Service's automation efforts, and that the expansion would alleviate the Postal Service's concerns about incompatibility with "worksharing" principles, as it could be justified on the principle of equal access. *Id.* It also discounted the Postal Service's concerns about the difficulty and expense of educating the public about the proper use of the PAR stamp, suggesting that awareness and enforcement could be achieved through media coverage, distributors' instructions, the Postal Service's existing postage-due system and businesses' late-charge structures. *Id.* at V–81–82.

In seeking judicial review of the Commission's PAR recommendation, the Governors objected that "the classification change actually recommended by the Commission was not advanced on the record by any party, contains significant elements for which no record evidence was adduced, and is justified to us on grounds for which there was no witness or advocate." See Decision of the Governors of the USPS on the Recommended Decision of the PRC on PAR Mail, Docket No. R90–1, at 1 (Jan. 22, 1991) [hereinafter USPS PAR Decision] (Joint Appendix ("J.A.") Vol. I at 63). They argued that there were legitimate, non-arbitrary reasons to distinguish between bulk and nonbulk mail, including the opportunity to examine bulk mail to determine whether it conformed to the criteria to receive this discount. "Furthermore," they added, "we are greatly troubled by the manner in which the Commission has apparently attempted to obliterate our ability to exercise independent review of separate classification proposals." *Id.* They elected to allow the rate to go into effect and to seek judicial review.

## B. Analysis

### 1. Jurisdiction

■ Before reaching the merits of this dispute, we address a jurisdictional challenge. The PAR proposal is before us under the "allowance under protest" option, through which the Governors "allow a recommended decision of the Commission to take effect and ... seek judicial review thereof...." 39 U.S.C. § 3625(c). The Governors have not, however, actually allowed the rates to go into effect, as they (along with the Postmaster General and Deputy Postmaster General) have never set an effective date for this change, as they are authorized to do by § 3625(f).[6] The Commission argues that this failure deprives this court of jurisdiction.[7] The Postal Service responds that the only jurisdictional precondition for review is the filing of the petition within fifteen days after publication of the Governors' decision. *See* 39 U.S.C. § 3628.[8] Moreover, responds the Postal Service, setting the effective dates for rate or classification changes is left to the Board's discretion, and the Board's decision to delay implementation of the PAR is a reasonable exercise of this discretion.

■ We agree that a challenged rate or classification change need not always and necessarily be in effect to be reviewable in a

---

**6.** This subsection provides:

The Board [of Governors] shall determine the date on which the new rates, fees, the mail classification schedule, and changes in such schedule under this subchapter shall become effective.

39 U.S.C. § 3625(f).

**7.** The Commission also argues that, by seeking judicial review instead of returning the PAR to the Commission for further consideration, the Postal Service failed to exhaust its administrative remedies. Nothing in the statute, however, requires that the Postal Service seek Commission reconsideration before it seek judicial review. To the contrary, the statute requires a second pass through the Commission only where the Postal Service seeks to *modify* a Commission

recommendation. *See* 39 U.S.C. § 3625(c) and (d).

**8.** Section 3628 provides in relevant part that:

A decision of the Governors to approve, allow under protest, or modify the recommended decision of the Postal Rate Commission may be appealed to any court of appeals of the United States, within 15 days after its publication by the Public Printer, by an aggrieved party who appeared in the proceedings under section 3624(a) of this title.... No court shall have jurisdiction to review a decision made by the Commission or Governors under this chapter except as provided in this section.

court of appeals under § 3628. The timing of the two occurrences—judicial review of a ratemaking decision and the setting of an effective date for a change—are governed by different statutory requirements and therefore, need not coincide precisely. The time-clock for judicial review runs rapidly. The appeal must be made within fifteen days. 39 U.S.C. § 3628 ("The court shall make the matter a preferred cause and shall expedite judgment in every way."). The allowance under protest option is part of an elaborate ratemaking structure designed to allow the expeditious setting of rates. *See* H.REP. NO. 1104, 91st Cong., 2d Sess. 19 (1970), *reprinted in* 1970 U.S.C.C.A.N. at 3649, 3667 ("timeliness in the rate-making process is imperative"). These provisions reflect congressional concern that protracted disputes over rates and classifications not block the adequate flow of revenues to the Postal Service. *Id.; see also Time, Inc. v. USPS*, 685 F.2d 760, 767 (2d Cir.1982) ("Congress clearly made every attempt possible to ensure that the Service's cash flow would not be disrupted"). In fact, "the very purpose of the 'allowance under protest' option was to enable the Service to realize additional revenues pending the Board's resolution of its differences with the PRC." *Time,* 685 F.2d at 767.

■ The timeframe for implementing new rates and classifications is more discretionary. The statute provides only that the Board of Governors shall determine effective dates. 39 U.S.C. § 3625(f). While this provision is included in a section dealing with ratemaking, and could therefore be deemed subject to its timeliness concerns, we find significance in the fact that this is the only provision in § 3625 that vests authority in the *Board* of Governors, which includes the Postmaster General and the Deputy Postmaster General, and not in the Governors themselves. We believe that the participation of the top Postal Service managers in this decision signals that it falls within the Postal Service's general managerial authority, which Congress sought to insulate from PRC interference. *See Newsweek,* 663 F.2d at 1203–05 (the Board, and not the PRC, has

exclusive authority to manage and to make policy decisions for the Postal Service, and reductions in Postal Service contingency fund recommended by the PRC "improperly encroached on the managerial authority of the Board"); *Governors,* 654 F.2d at 114 (legislative history of PRA "demonstrates the intention of Congress to vest in the Board of Governors exclusive authority to manage the Postal Service"). Under the PRA, only the Governors participate in ratemaking; these ratemaking "powers, duties and obligations" are nondelegable. 39 U.S.C. § 402. The Board of Governors, by contrast, has "all authority for operations," S.REP. NO. 912, 91st Cong., 2d Sess. 5 (1970), and this authority, which the Postmaster General shares as a member of the Board, may indeed be delegated solely to him under any terms the Board desires. 39 U.S.C. § 402. We have previously stated that the determination of an ending date, as opposed to a starting date, of a rate or classification change is a management decision, *Governors,* 654 F.2d at 115, even though "[t]he law [was] silent on ending dates," *id.* at 112. Here, by contrast, the law explicitly gives the Board the authority to set starting dates, reaffirming that this decision is reserved to postal management.

■ As an operational decision, the timing of rate changes should be determined not by the judicial review timetable, but with regard to the constraints and realities of running an efficient Postal Service. In their January 22 decision seeking judicial review of the PAR, the Governors made clear that "[t]he Board will need to determine several factors, including, at least, how quickly the requisite stamps can be printed and distributed, and the public education program (acknowledged to be necessary by the Commission) begun, before it can set an effective date to carry this decision into effect." USPS PAR Decision at 10 (J.A. Vol. I at 72). In its briefs to this court, the Postal Service points to several factors related to the feasibility and the revenue consequences of implementing the PAR that have delayed its implementation to date.[9]

9. On the question of feasibility, the Governors point to the lead time necessary to print new

denominations of stamps and to several uncertainties surrounding postal rates since January

■ If actually putting the rates into effect were a jurisdictional requirement, the Postal Service would be expected to implement sweeping, complex changes without regard to these and other pressing managerial considerations, and arguably even within the fifteen days before it must seek review. This reading cannot represent the proper balance between Congress's concern for expedited judicial review of ratemaking decisions and its solicitude for postal management's "unfettered authority and freedom ... to maintain an efficient service," and for the Postmaster General's freedom to serve as a "responsible manager." S.Rep. No. 912, 91st Cong., 2d Sess. 2 (1970). We are convinced, instead, that, even within the context of the allowance under protest option, the setting of "effective dates for the implementation of rate and classification decisions [is] explicitly the responsibility of the Board of Governors," *Governors*, 654 F.2d at 112, and not a jurisdictional prerequisite for judicial review.[10]

## 2. Substantial Evidence

■ The most serious of the Postal Service's challenges on the merits is that the record on the PAR proposal does not satisfy the substantial evidence test of 5 U.S.C. § 706(2)(E). This court can uphold the PRC's recommended decision only if it is based on "such 'relevant evidence as a reasonable mind might accept as adequate to support [the] conclusion.'" *Consolidated Oil & Gas, Inc. v. FERC*, 806 F.2d 275, 279 (D.C.Cir.1986) (quoting *Universal Camera*

*Corp. v. NLRB*, 340 U.S. 474, 477, 71 S.Ct. 456, 459, 95 L.Ed. 456 (1951)). The evidence must be found "within the record of closed-record proceedings to which it exclusively applies. The importance of that requirement should not be underestimated." *Association of Data Processing Serv. Orgs. v. Board of Governors*, 745 F.2d 677, 684 (D.C.Cir.1984). In their order allowing the PAR under protest, the Governors found "no record basis for determining either the cost or revenue consequences of combining prebarcoded reply mail and bulk prebarcoded mail to create the Commission's classification." USPS PAR Decision at 4 (J.A. Vol. I at 66). Moreover, challenged the Governors, because the PAR classification included a type of mail—self-generated single entry prebarcoded letters—that was not addressed at the hearings, the Commission had to "venture into the realm of speculation with regard to both costs and revenues." *Id.* at 9 (J.A. Vol. I at 71).

The hearings before the PRC adduced evidence as to only two of the three components of the PAR: The Postal Service presented evidence as to prebarcoded bulk mail, and the OCA presented evidence as to prebarcoded CEM. The third component of the PAR, the nonbulk, non-CEM prebarcoded mail, which the PRC estimated would make up roughly 38% of PAR volume (2.7 billion pieces of mail), see PRC Op. at V-60, was not the subject of any testimony. It first surfaced in the Commission's recommended decision. Consequently, we find inadequate

1991. First, the PAR proposal was for a two-cent discount from the base rate, and the Governors were seeking Commission reconsideration of the base rate of 29 cents until 1992, when they rejected the Commission's third recommended decision. Second, because stamp production capacity was stretched to the limit, it would have taken months to print the new 27-cent stamp. (The Postal Service had the nondenominated "flower" stamp ready to be issued at whatever the rate was set for First Class letters, but did not have a second standby for a PAR discount denomination.) Third, the Postal Service filed a March 18, 1991 motion for expedited review of the Governors' PAR appeal in order to resolve the "practical difficulties that have impeded implementation" of that proposal. The Commission, however, opposed this motion, arguing for simultaneous consideration of all issues arising from the rate proceeding.

As for revenue consequences, the Postal Service claims that, pending the permanent outcome of the PAR proposals, public confusion over what mail qualifies for the discount could have serious revenue consequences. Although the Postal Service did not elaborate on this point, we take it to mean that the Postal Service's inability to undertake the necessary public education and enforcement on a short-term interim basis could result in additional lost revenues, through non-compliance and additional postage due expenses—problems it raised during the hearings.

10. Our conclusion that the Board has discretion to set the effective dates for rates and classifications that are allowed under protest does not rule out a claim that an unreasonable delay could constitute an abuse of that discretion. That issue was not litigated here.

record support on two issues: the PRC's estimates of the volume of nonbulk, non-CEM PAR mail and the automation acceptance rate of this component of the PAR.

As for its estimate of the volume of non-CEM, nonbulk mail that would qualify for the PAR discount, the Commission stated:

> Of greatest significance, the table contains an estimate of discount-induced nonpresort letters in nonbulk quantity. We are estimating that five percent of nonhousehold, nonpresorted mailstream will qualify for the Public's Automation Rate discount. This estimate is generous. It is doubtful that single-piece mailers, exclusive of courtesy envelope mail, will find it cost efficient to prebarcode 2.76 billion letters. Mail likely to fall within this provision will come from nonhousehold mailers with barcoding capability who don't have sufficient volumes or incentives to qualify for bulk discounts.[11]

*Id.* at V–62–63. The Postal Service and the Governors complain of the absence of testimony on the availability and expense of equipment that would allow businesses to generate non-CEM prebarcoded mail, from which the PRC could conclude that it was "doubtful" that single-piece mailers would find PAR cost-effective, and of the Commission's "acknowledged uncertainty" surrounding its estimates of nonhousehold CEM volumes and the "unknown potential" for intentional or unintentional misuse of the PAR stamp. The Commission responds primarily that OCA "suggest[ed] on brief" that the publishing software was prohibitively expensive for small mailers, and that this observation was "consistent with the Commission's own understanding of the expense and difficulty of acquiring barcode capability." Neither the OCA's "suggestion" nor the Commission's "understanding" however, was ever revealed and tested on the record. Nor were the parties given any opportunity to examine the bases for the Commission's conclusion that consumers generally would not "make the effort or investment to use computers to develop envelopes with barcodes and FIMs

. . . in order to obtain the discount." See PRC Op. at V–82. Accordingly, we find no evidence, much less substantial evidence, to support the Commission's estimate.

The record is similarly lacking in evidence to support the PRC's estimated automation acceptance rates for nonbulk, non-CEM mail produced by small businesses or households. The PRC relied on testimony about CEM to make predictions about the automation acceptance rate for non-CEM individual letters. The Postal Service objects, however, that "self-generated" non-CEM letters might present barcodes that are less legible or less accurate or envelopes that pass less smoothly through automation. There was, in fact, no testimony on these cost characteristics of nonbulk non-CEM PAR mail, as the OCA witness expressly confined its proposal to "*mailer-provided* CEM envelopes," arguing that "[t]he technology available for the preparation of 'routine office mail' [was] irrelevant to the CEM proposal, because such mail would not be reply mail." Testimony of OCA Witness Pamela A. Thompson, J.A.Vol. III at 813–14; *see also id.* at 815–16.

■ Substantial evidence "need not be overwhelming evidence." *Japan Air Lines Co. v. Dole,* 801 F.2d 483, 489 (D.C.Cir.1986), *cert. denied,* 480 U.S. 917, 107 S.Ct. 1372, 94 L.Ed.2d 688 (1987). And even in "on the record" proceedings, an agency must have latitude to draw permissible inferences from and to make findings based on the evidence in the record. *See George Hyman Constr. Co. v. Washington Metrop. Area Transit Auth.,* 816 F.2d 753, 758 (D.C.Cir.1987) (an agency's inferences should rest upon some findings that are themselves supported by substantial evidence in the record as a whole) (citing *Teamsters v. NLRB,* 587 F.2d 1176, 1181 (D.C.Cir.1978)); *Public Citizen Health Research Group v. Tyson,* 796 F.2d 1479, 1485 (D.C.Cir.1986) (agency required " 'to identify relevant factual evidence, to explain the logic and policies underlying any legislative choice, to state candidly any assumptions on which it relies, and to present its reasons for rejecting any significant evidence and

---

**11.** Elsewhere, the Commission applied the five percent estimate to household, as well as non- household, mail. See PRC Op. app. L at 2 n. 12.

argument' ") (internal citation omitted). Here, however, the record was devoid of any evidence to support the PRC's estimates of the volume or the automation acceptability of non-CEM, nonbulk prebarcoded mail. Nor can the PAR properly be considered a mere "amalgam" of the proposed categories, such that the Commission could properly base its recommendation on the evidence as to those categories. *See, e.g., Association of American Publishers, Inc. v. Governors of the USPS*, 485 F.2d 768, 773 (D.C.Cir.1973) (upholding PRC recommendation where Commission "split the difference" between two methods presented on the record). Accordingly, given the unanswered—and unaddressed—questions about both of these issues, we conclude that the Commission's PAR recommendation does not satisfy the substantial evidence test, and we "order that the entire matter be returned for further consideration." 39 U.S.C. § 3628.

### 3. The Commission's Statutory Authority

 The Postal Service also claims that the Commission exceeded its statutory authority in proposing the PAR category. Clearly, the Commission lacks the statutory authority to issue a recommended decision that is not supported on the record, but the Postal Service's challenge goes beyond this, claiming that "the Commission cannot foist mail classification changes on the Postal Service Governors by recommending only one set of rates which presumes adoption of a classification change," and that, in these circumstances, the Commission is required to recommend alternative rate schedules, one with the new PAR category, and one without. Although we reject this casting of the Commission's duties, we do believe that the handling of the PAR category raises troublesome questions about the Commission's statutory authority, questions which were not sufficiently aired on the record. Because we must remand the PAR recommendation to the Commission in any case, we think it useful to discuss briefly the permissible scope of the Commission's actions in issuing its recommended decisions. Accordingly, we address the following question: Assuming that the Commission had complied with the requirements of a record hearing, would it have had the statutory authority to propose the PAR in the first place?

 Although the Governors initiate the ratemaking process by requesting a recommended decision on changes in certain rates, the Commission is certainly authorized to do more than give a thumbs up or thumbs down on the Governors' request. The Commission must hold hearings at which it receives—and considers—testimony from an array of mail users, as well as from an officer of the Commission who represents the interests of the general public. 39 U.S.C. § 3624(a). The Commission is charged with exercising independent discretion to determine that the rates it recommends comply with nine statutory criteria. 39 U.S.C. § 3622(b). Similarly, the Commission must exercise its discretion to determine that any classification it recommends conforms to six statutory criteria, including the "desirability of special classifications from the point of view both of the user and of the Postal Service." *Id.* § 3623(c)(5). With regard to both rates and classifications, the Commission is authorized to consider not only fairness and equity, *id.* §§ 3622(b)(1) & 3623(c)(1), but "such other factors as the Commission may deem appropriate," *id.* §§ 3622(b)(9) & 3623(c)(6), a further attestation to the Commission's broad discretion.

 That said, we caution that the Commission's authority is not without bounds. The statute does require that the Commission issue a recommended decision *"on the [Postal Service's] request for changes in rates or fees in each class of mail or type of service,"* 39 U.S.C. § 3622(b) (emphasis added), which indicates that the scope of the Commission's recommendation is normally to be governed by the scope of the Postal Service's original request. The Governors, after all, have the exclusive authority to initiate the ratemaking, based on their management goals and revenue needs, and the PRC is instructed to provide an expedited hearing on their request. *See Dow Jones*, 656 F.2d at 790 (Governors initiate rate request because "[t]he PRC does not possess the Postal Service's command of the cost, revenue and vol-

ume information that is crucial to rate matters, nor is the PRC responsible for operating within a requested budget.") A ratemaking, therefore, is inevitably circumscribed to some extent by the parameters of the Postal Service's request; it is not an open invitation for the Commission to propose wide-ranging and unrelated changes in classifications. To open up these proceedings to extraneous initiatives would undermine the timeliness concerns that govern ratemaking. *See* H.REP. No. 1104, 91st Cong., 2d Sess. 19 (1970), *reprinted in* 1970 U.S.C.C.A.N. at 3649, 3667 ("timeliness in the rate-making process is imperative"). Finally, the Commission's domain is exclusively ratemaking, and its recommendations are not to trench on the management authority of the Postal Service. *Governors,* 654 F.2d at 115; *Newsweek,* 663 F.2d at 1205; *see* S.REP. No. 912, 91st Cong., 2d Sess. 5 (1970) (Board of Governors has exclusive authority to make policy and management decisions governing the Postal Service).

■ The Commission says that it proposed its PAR category because it believed that equity and fairness required extending automation discounts to households and small businesses, as well as to the large volume mailers who could take advantage of bulk and CEM discounts. On its face, this is the kind of determination the Commission is allowed, and indeed required, to make. *See* 39 U.S.C. § 3623(c)(1). There is also an argument to be made that, given that the OCA had proposed granting a discount to CEM mail, which includes certain individually mailed, prebarcoded, automation-compatible letters, the Commission was, barring other obstacles, permitted to respond by proposing the expansion of the classification to include other individually mailed, prebarcoded, automation-compatible letters. Similarly, since the Commission's recommendation was based on its determination about the unfairness and

inequity of granting the discount to certain users and not others, the Commission was arguably justified in proposing to yoke together the individual letters produced by the "big guys," and those produced by small businesses and households, that is, the CEM mail and the nonbulk, non-CEM prebarcoded mail.[12]

■ Once the Commission had made such a proposal within the context of the ratemaking hearings, the Postal Service, as the manager of the mails, would then have had the opportunity to respond, raising issues relating to the proposal's effects on postal operations and policy. For example, the overall pace and course of extending Postal Service automation must generally fall within the Postal Service's exclusive authority over management decisions. While the Commission may be entitled to say that it is unfair to extend an automation discount to one user and not to another, it is not within the Commission's province to recommend rates and classifications in order to accelerate the expansion of Postal Service automation. *See Governors,* 654 F.2d at 117 (quoting *United Parcel Serv.,* 455 F.Supp. at 873) (Commission not accorded " 'responsibility for industry guidance [or] wide discretion in choosing the appropriate manner and means of pursuing its statutory objective' "); *id.* at 115 ("[A] management decision by the Postal Service may not be overruled or modified by the Rate Commission.").

■ In sum, the Commission's authority unfolds as follows: During the course of a ratemaking proceeding, the Commission has the authority, and indeed the duty, to assess the fairness and equity both of the proposals before it and of its own recommended decision to the Governors. 39 U.S.C. §§ 3622(b)(1), 3623(c)(1); *see also National Ass'n of Greeting Card Pubs. v.*

---

12. There appear to be other concerns, however, surrounding the combination of bulk and nonbulk mail into a single classification. Several factors—including the opportunity to inspect bulk mail, the evidence of its higher automation acceptance rates and its delivery to bulk mail acceptance facilities—may require separate classifications for the two types of mail. We caution the Commission that it must have a reasonable basis for combining different types of mail into a single recommended classification. *See Newsweek,* 663 F.2d at 1206 (criticizing Commission for "attempt[ing] to circumvent the [Governors'] scrutiny ... by appending several classification changes to its rate recommendations, believing that the [Governors] would be pressured to accept them").

*USPS,* 607 F.2d 392, 403 (D.C.Cir.1979) (the "prevention of discrimination among the mail classes" was major purpose of Congress in passing PRA), *cert. denied sub nom. Dow Jones v. United States Postal Serv.,* 444 U.S. 1025, 100 S.Ct. 688, 62 L.Ed.2d 659 (1980). As stated above, this proposal should be responsive to and within the scope of the Postal Service's request. Once the Commission puts forward a proposal that it deems necessary for reasons of fairness and equity, however, it has the additional duty to consider whether this proposal interferes with the Postal Service's management authority. Permitted to put on evidence, the Postal Service may well be able to demonstrate that a proposed rate or classification is either unworkable or inconsistent with general Postal Service objectives and policies. Since the Postal Service's Board of Governors, and not the Commission, has the " 'exclusive authority to manage' " the Postal Service, *Newsweek,* 663 F.2d at 1203 (quoting *Governors,* 654 F.2d at 114), the PRC would be beyond its statutory authority in issuing a recommended decision that unduly interfered in the management and direction of the Postal Service. When that is the case, the Commission has two options. First, it may conclude that, within the framework of existing Postal Service policies and capabilities, a rate or classification that it had considered unfair or inequitable, is, instead, sufficiently fair to be included in its recommended decision. It presumably would not be unfair, for instance, to refrain from extending a discount to certain users where it is not feasible to offer it to them, or where offering it would cause an upheaval in the efficient operation of the Postal Service. Second, the Commission

may simply decline to recommend a rate or classification that it is convinced is unfair. It may not, however, under the statute's ratemaking structure, forge ahead with a recommendation that surpasses its ratemaking function and unduly intrudes on management.[13]

This dispute highlights the tension between the respective roles of the Commission and the Postal Service. Virtually every rate or classification recommendation will have some impact on Postal Service operations and policies; any such effect alone cannot be permitted to tie the Commission's hands. At the same time, some Postal Service rate requests, which must take into account efficiency, available resources, and long-range policies, may, in the Commission's view, result in real or perceived inequities; in remedying these inequities however, the Commission does not have *carte blanche* to intrude as far as it wishes into Post Office management.

Had the PAR proposal been presented and aired in the hearings, we would be better able to assess whether the Commission's recommendation unduly interferes with the Postal Service's management decisions or otherwise exceeds the Commission's statutory authority. The record presumably would reveal whether there are overriding operational or policy reasons to distinguish between CEM and non-CEM prebarcoded individual letters, as well as between bulk and nonbulk automation-compatible pieces, or whether, as the Commission claims, it is unduly discriminatory to extend the discount to large-scale mailers and not to the general public. We simply cannot tell on this record. We write at this point only to clear up some

---

**13.** The Postal Service, in claiming a right to alternative PRC recommendations, reads too much into *Newsweek.* In that case, the Second Circuit concluded that it was improper for the PRC to recommend rates which were "inconsistent with the existing classification schedule" and "contingent upon a change in classification which had neither been discussed nor proposed in any record proceeding." *Newsweek,* 663 F.2d at 1206. The court concluded that, since the Commission's proposed changes "were, legally and practicably speaking, impossible to implement," *id.* at 1207, the Board was not required to reject the entire recommended decision, at the cost of needed revenues, but could properly disregard the "small and improper change." *Id.*

*Newsweek,* therefore, stands for the proposition that the Board, in certain narrow circumstances, may disregard improper recommendations by the Commission, not—as the Postal Service contends—that the Commission is required to issue alternative recommendations. Moreover, although the *Newsweek* court concluded that the PRC could not properly recommend rates that were "contingent upon a change in classification which had neither been discussed nor proposed in any record proceeding," *id.* at 1206, it did not hold that the PRC could not, within the context of a ratemaking hearing, propose a classification change that was a variation of one proposed by the Postal Service or another witness.

of the parties' misconceptions about the Commission's proper role in ratemaking and to expedite a resolution of the merits on reconsideration.

## III. Institutional and City Carrier Costs

■ Next, we address two challenges to the third class bulk rate regular (BRR) mail rates recommended by the Commission. Section 3622(b)(3) of the PRA "require[s] that each class of mail or type of mail service bear the direct and indirect postal costs attributable to that class or type plus that portion of all other costs of the Postal Service reasonably assignable to such class or type." 39 U.S.C. § 3622(b)(3). In interpreting this requirement, the Commission has adopted a "two-tiered" system of setting rates for the various classes of mail—an approach the Supreme Court expressly upheld in *National Association of Greeting Card Publishers*. In that opinion, the Court explained:

> Under this approach, the Rate Commission first must determine the costs caused by ("attributable to") each class of mail, § 3622(b)(3), and on that basis establish a rate floor for each class.... The Rate Commission then must "reasonably assign," *see* § 3622(b)(3), the remaining costs to the various classes of mail on the basis of the other factors set forth in § 3622(b).

462 U.S. at 815, 103 S.Ct. at 2722. Four petitioners [14] jointly challenge aspects of both tiers. They object first to the amount of "remaining," or "institutional," costs the Commission assigned to BRR mail and second, joined by the Postal Service, to the Commission's attribution of city carrier access costs to BRR mail.[15] We uphold as reasonable the Commission's assignment of institutional costs but remand for further consideration its attribution of city carrier access costs because the parties were not afforded an opportunity during the ratemaking hearing to scrutinize its attribution methodology.

## A. Institutional Costs

■ First, the petitioners object to the increased share of institutional costs assigned to BRR mail under the recommended rates, particularly as compared to the reduced share assigned to first class mail. In its rate request, the Postal Service proposed a 20% increase in the first class rate and a 17% raise in the BRR mail rate, while the Commission's decision recommended raises of, respectively, 15% and 25%. The Commission's primary rationale for deviating from the Postal Service's request was to alleviate, but not eradicate, a perceived inequity in institutional cost allocation. In the Commission's view, the existing rates imposed on first class mail an inequitably high share of institutional costs, while assigning to BRR a disproportionately low share.[16] Nevertheless, the Commission refrained here from narrowing the gap as much as it deemed necessary to achieve complete fairness because of the impact a higher increase might have on BRR mailers. Despite this restraint in their favor the petitioners ask us to remand the new BRR institutional cost assignment on the ground that the Commission ignored the statutorily mandated criteria for assigning institutional costs, enumerated above,[17] and relied instead on an invalid "presumption" or "policy objective" of "equal or near equal cost coverages or markups for [first class mail] and BRR, at or near the systemwide average." Petitioners' Brief at 10. We disagree.

Our review of the Commission's institutional cost assignment, to which the Postal Service did not object in its January 22, 1991,

---

14. These are Mail Order Association of America, Advertising Mail Marketing Association, Direct Marketing Association and ADVO, Inc.

15. In their February 27, 1991 Reply to Comments on Governors' Request for Reconsideration, the Governors questioned the institutional cost assignment as well but they have not done so since, either in their decisions or in their brief here.

16. The Commission attributed the disparity in part to the 1987 ratemaking in which it raised the first class rate to 25 cents, even though it believed the appropriate rate lay somewhere between 24 cents and 25 cents, because it was constrained to establish a whole-number first class rate.

17. *See* 39 U.S.C. § 3622(b), *supra* at 415.

decision, is narrow. As we have previously observed:

> No one who seeks fairly and equitably to determine a complicated rate structure ought to suppose that there is a correct answer, or even that in the final mix there should have been added a specified number of spoonfuls of each of the ingredients. A conscientious, competent rate-making body proceeds by opening its mind to relevant considerations, and closing its ears to irrelevant ones. It is governed by policies not politics.
>
> A reviewing court under familiar jurisdictional principles may not, and under human limitations generally could not, reassess the weights given by a rate-making agency to different factors, absent a legislative direction as to precisely what gravity each factor bears. All that the court may properly do is to consider whether the agency did take into account all the relevant factors and no others.

*Association of American Publishers,* 485 F.2d at 774–75. Because the Commission adequately considered the relevant statutory factors set out in 39 U.S.C. § 3622(b), its institutional cost assignment must be upheld.[18]

First, there can be no dispute that the Commission espoused as a goal "the establishment and maintenance of a fair and equitable schedule," as required by subsection (b)(1) of the statute. The recommended decision expressly, and repeatedly, acknowledged that the Commission's primary motivation in setting the first class and BRR assignments as it did was to lessen what it viewed as inequities in the existing rates and render fairer the relative institutional cost burdens borne by BRR and first class mail, the two largest classes. Nor do we find it unreasonable that the Commission concluded that setting the cost coverages for the two largest classes of mail near the system-wide average promotes fairness. We note that the Commission neither espoused nor established equal coverages for BRR and first class mail.

Instead, it expressed a desire, based on historical rates and fairness, that each of the two classes be assigned institutional costs that bear a relationship to its attributable costs similar to the system-wide average relationship, that is, that the ratio of institutional to attributable costs for both BRR and first class mail be near the system-wide average ratio. The actual ratio resulting from the recommended institutional assignments remains below the system-wide average for BRR mail and above the system-wide average for first class,[19] as it traditionally has. *See Direct Mktg. Ass'n v. USPS,* 778 F.2d 96, 102 (2d Cir.1985) (interpreting "traditional relationship" between BRR and first class institutional cost assignments to mean "a cost coverage for BRR that [is] lower than that for First–Class and the systemwide average").

Second, the Commission also considered "the value of the mail service actually provided each class or type of mail service to both the sender and the recipient," as required by subsection (b)(2), and found that the "value of service evidence is that it largely reiterates arguments already considered in past proceedings, and which have been reflected already, to the extent possible, in the existing markups." The Commission further noted that "[t]hird-class service has not changed significantly in the last three years." PRC Op. at IV–37.

Third, the Commission considered "the effect of rate increases upon the general public, business mail users, and enterprises in the private sector of the economy engaged in the delivery of mail matter other than letters," as required by subsection (b)(4). The Commission expressly noted it "would prefer to obtain an [even] larger contribution" of institutional costs from third class mailers, but declined to do so because the recommended rates already "result in a substantial, 25 percent rate increase for this subclass" and it "c[ould] not reasonably recommend greater increases as they would be too likely to cause

---

18. The Commission need address each of the factors only to the extent that it is pertinent; here, the Commission has done so.

19. The recommended institutional cost burden for BRR mail is 7% below the system-wide average while the first class share is 24% above that average. *See* PRC Op. at ii (Executive Summary); *id.* app. G, sched. 3, at 1.

severe dislocations within the subclass." *Id.* at IV–32; *see also id.* at IV–33 n. 16. As for private sector competition, the Commission concluded that BRR mail "is largely subject to the statutory monopoly," *id.* at IV–8, and that "the competitive stance of private delivery carriers does not require additional recognition through a larger than reasonable contribution to maintain the appropriate 'level playing field' conditions." *Id.* at IV–37.

Fourth, the Commission considered "available alternative means of sending and receiving letters," as required by subsection (b)(5), in its repeated and emphatic comparison of BRR and first class mail [20] and in its recognition, just noted, that no effective private competition to BRR mail exists.

Fifth, it is undisputed that the Commission considered the cost-reducing effects of mailer preparation, as required by subsection (b)(6), by establishing "pre-sort discounts" for qualifying BRR mail. *See id.* at V–164.

Finally, there can be no doubt that the Commission considered "identifiable relationships between the rates or fees charged the various classes of mail for postal services," as required by subsection (b)(7). In fact, it is an alleged over-reliance on the relationship among rates to which the petitioners primarily object.

For the preceding reasons, we conclude the Commission properly applied the relevant statutory factors [21] to the evidence and that its institutional cost assignments must therefore be upheld.

## B. City Carrier Access Costs

 Next, the same four petitioners, along with the Postal Service, challenge the Commission's method of attributing "city carrier access costs," one component of attributable costs. City carrier access costs are "the costs incurred when the carrier deviates from his route to access a delivery point."

PRC Op. at III–26. Traditionally, access costs have been attributed to mail subclasses based on a "volume variability" formula that related "access costs" to a particular subclass's mail volume. Generally, the greater the volume of the subclass's mail, the greater the attributed access costs. This approach assumes, with some logic, that the more mail a subclass generates the more stops it will require.

In its 1987 ratemaking the Commission changed course somewhat, concluding that a volume variability approach was not by itself sufficient to recover access costs. As the Commission reasoned in its 1987 decision, "the current treatment of access time results in the somewhat paradoxical result that as volume rises over time, more possible stops receive mail, and the potential for future volume increases to cause new stops approaches zero." Joint Addendum ("J.Add.") 59. To compensate for this perceived shortcoming, the Commission determined that, in addition to each subclass's variability-based costs, it would also attribute fixed costs based on the actual number of stops caused solely by the particular subclass, that is, where only that one subclass was delivered. *Id.* at 62–63.

The Commission's new double-barrelled approach came under heavy fire from the Postal Service during the 1990 hearings as causing "double-counting." In its January 4, 1991 recommended decision, the Commission concluded that "single subclass stop ratios . . . do not 'measure the same thing' that volume variability measures," PRC Op. at III–49, but conceded that its 1987 approach produced "some overlap in volume variable access costs and single subclass access costs . . ., although not for the reasons offered." *Id.* at III–41. The Commission then, relying on various new graphs and diagrams, set out its explanation for the overlap and proposed a methodology to cure it.

20. The Commission observed: "One of the basic tenets of historical institutional cost allocation by this Commission is that care must be taken to avoid unfairly penalizing First–Class Mail, which is the basic means of written personal and business communications in this country, yet is subject to a statutory monopoly." PRC Op. at IV–7 to 8.

21. Under the circumstances we do not find particularly relevant the factors set out in subsections (b)(8) ("the educational, cultural, scientific, and informational value to the recipient of mail matter") and (b)(9) ("such other factors as the Commission deems appropriate.").

The Commission first identified four categories of subclass stops: "non-volume variable single subclass stops," "non-volume variable multiple sub-class stops," "volume variable single subclass stops," and "volume variable multiple subclass stops." *Id.* at III–50. Next, the Commission concluded that "[a]ny volume variability measure in excess of [volume variability multiple subclass stops] ... will necessarily involve an overlap, because it will include variability arising from incremental single subclass stops." *Id.* at III–51. The Commission reasoned it could eliminate the overlap by deducting the cost of volume variable single subclass stops from the total cost of all volume variable mail stops. The Commission acknowledged that its approach presented a problem in that "[c]urrently, there is no dataset that allows us to estimate the effect of volume increases over time on the ratio of new single class stops to total new stops," *id.* at III–54, but concluded that "[t]he most reasonable assumption is that the percentage of total new stops that would be single subclass is similar to the current percentage of total stops that are single subclass," noting it "ha[d] no data implying [it] should deviate from this assumption in either direction." *Id.* Based on its assumption, the Commission then calculated attributable access costs.

In its January 22, 1991 decision, the Postal Service objected to the Commission's access costs attribution because "it appear[ed] that to some extent this new analysis differs from analyses previously used by the Commission and from analyses presented in the record of this proceeding," "[n]o party presented evidence in support of the use of single subclass costs," and "in various instances the Commission relie[d] upon econometric analyses whose foundation in the record is unclear." Decision of the Governors of the USPS on the Recommended Decision of the PRC on Postal Rate and Fee Changes, Docket No. R90–1, at 8 (Jan. 22, 1991) (J.A. Vol. I at 8). The Postal Service concluded: "It would be helpful to us if the Commission would provide an explanation of how its analysis of the single subclass issue and the econometric analyses of city delivery cost variability it employed are based upon the evidence of record or stem from previous Commission

practice." *Id.* Shortly thereafter the Commission began to release its work papers supporting adoption of its access cost methodology and showing the figures and calculation used to set the rates.

In its Opinion and Further Recommendation and Decision, proposed on May 6, 1991 (hereinafter "PRC Further Rec.Dec."), the Commission attempted to explain its analysis more fully, conceding that "certain aspects of our conclusions ... were not subject to full testimonial challenge from all participants," PRC Further Rec.Dec. app. I at 39, and that it had "felt constrained to use analyses which, while available on the record, had not been subject to direct critical review for all possible purposes," *id.* at 40. Accordingly, the Commission decided "to allow all participants, including the Postal Service, two weeks to indicate whether they wish[ed] to offer testimony on [ ] these Commission actions." *Id.* at 41. The Commission further stated: "This order will, by itself, delay the rate setting process only two weeks. If participants respond that they have testimony to present which will further clarify the proper treatment of city delivery carrier costs, the delay will be extended; ... If, as we hope, the additional explanations provided in this Order resolve participants' concerns, and we receive no requests for an opportunity to offer testimony which critiques the Commission's application of record material to the attribution of city carrier out-of-office costs, we will issue our Further Recommended Decision immediately." *Id.* at 41–42.

In response, the four joint petitioners "inform[ed] the Commission that they would not file testimony in order to avoid extending the case further," PRC Further Rec.Dec. at 4, and no other party requested the opportunity to present testimony. According to the Commission, the Postal Service stated that it "would not attempt, in the area of carrier street time costs, to 'persuade the Commission of the erroneous nature of its methods and procedures, either through new testimony or through extended comments.'" *Id.* at 4. When no one came forward to proffer testimony, the Commission issued its further recommended decision on May 24, 1991.

In its July 1, 1991 decision, rejecting the Commission's second decision, the Postal Service again questioned whether the city carrier cost question had been subjected to sufficient public scrutiny, given that "so much of the Commission's explanation is founded on what it describes as its 'justified inference' that the parties did not review with sufficient care" and that "some of the precedential value is founded upon thoughts the Commission says it was entertaining in [the 1987 proceeding] but only recently took the occasion to express." Decision of the Governors of the USPS on the Further Recommended Decision of the PRC on Postal Rate and Fee Changes, Docket No. R90–1, at 19 (July 1, 1991) (J.A. Vol. I at 97).

Finally, in its January 6, 1992 decision, rejecting the Commission's third recommended decision, the Postal Service again criticized the Commission's methodology, asserting it had "conducted a series of its own econometric investigations of [ ] data, and applied a variety of new and untested analytic procedures without benefit of a witness or a party advocate." Decision of the Governors of the USPS on the Recommended Decision of the PRC upon Further Consideration on Postal Rate and Fee Changes, Docket No. R90–1, at 16 (Jan. 6, 1992) (J.A. Vol. I at 119).

In this review we need not consider the validity of the Commission's new approach to city carrier access cost attribution but only whether it followed proper procedure in adopting it. The four petitioners and the Postal Service contend the access cost attribution must be remanded because the Commissioner's new methodology was not subjected to "a hearing on the record" as required by the PRA. The Commission, on the other hand, relies on a waiver argument, asserting that because the Postal Service and the petitioners declined the Commission's May 6, 1991 invitation to proffer testimony, they "simply cannot be heard to complain that the Commission's carrier cost methodology is insufficiently explained." Respondent's Brief at 36. We reject the Commis-

sion's waiver theory and conclude the city carrier access cost attribution should be remanded.

The PRA stipulates that "the Commission shall not recommend a decision until the opportunity for a hearing on the record under sections 556 and 557 of title 5 has been accorded to the Postal Service, users of the mails, and an officer of the Commission who shall be required to represent the interests of the general public." 39 U.S.C. § 3624(a). A review of the record makes clear that the Commission's novel access cost methodology was never subjected to scrutiny during the hearing, as required under the Act and, by incorporation, sections 556 and 557 of the APA.[22] It was not until the January 4, 1991 recommended decision that the overlap theory sprang suddenly to life, emerging full-grown from the Commission's collective brain.

In *Newsweek,* the Second Circuit, under similar circumstances, set aside a PRC decision to "slash[ ] $143 million from the Postal Service's revenue requirements by recalculating Postal Service productivity using two methodologies not introduced during the hearings," reasoning that "the PRC's productivity adjustments were not based on record evidence" and therefore "the PRC's action violated the mandate contained in 39 U.S.C. § 3624(a) that the PRC base its decisions upon materials presented at record hearings conducted pursuant to 5 U.S.C. §§ 556 and 557." Because of the procedural inadequacy, the court remanded to the Commission with the direction "to subject its productivity adjustment rationale to the same hearing process as all other materials upon which it bases its recommended decisions." The same result is required here.

Section 556 of the APA provides: "A party is entitled to present his case or defense by oral or documentary evidence, to submit rebuttal evidence, and to conduct such cross-examination as may be required for a full and true disclosure of the facts." The parties

22. As noted above, the Commission itself conceded in its second recommended decision that it reached conclusions that "were not subject to full testimonial challenge from all participants"

and used analyses that "had not been subject to direct critical review for all possible purposes." PRC Further Rec.Dec. app. I at 39–40.

here were afforded no opportunity during the hearing to test, or even examine, the methodology the Commission ultimately adopted or the figures and calculations used to attribute access costs. In fact, it was not until after the Postal Service issued its January 22, 1991, decision that the Commission began to release its voluminous work papers. Had the new methodology, along with the Commission's figures and computations, been aired during the record hearing, the Commission might have discovered a usable "dataset" or at least elicited data to replace the "reasonable assumption" on which it relied to compute access costs. *Cf. National Ass'n of Greeting Card Pubs.*, 462 U.S. at 833–34, 103 S.Ct. at 2731–32 ("The legislative history supports the Rate Commission's view that when causal analysis is limited by insufficient data, the statute envisions that the Rate Commission will press for better data, rather than construct an 'attribution' based on unsupported inferences of causation."). Alternatively, the Commission might have been persuaded that the methodology or its implementation was flawed. Or any number of other results might have ensued. We simply cannot know.

■ Nor can we accept the Commission's contention that the initial procedural defects were cured by the Commission's belated invitation to the parties "to offer testimony." The simple taking of testimony is no substitute for the close scrutiny available in a full-blown section 556 hearing on the record, replete with discovery, cross-examination and rebuttal. *Cf. Newsweek*, 663 F.2d at 1205 (expressly noting that "the PRC sent out a Notice of Inquiry eleven days after the evidentiary record had closed and gave the parties seven days to file briefs and twenty days to comment" but that "[n]o discovery or cross-examination was permitted"). Thus, mere rejection of the Commission's limited offer cannot be deemed a waiver of the parties' rights to insist on the full procedural panoply that was due.[23]

The Commission argues that its order may be read to have contemplated the full range of procedures from discovery to cross-examination, rather than merely the parties' submission of testimony. We think, however, that this reading of the order is implausible in light of the Commission's language. For example, in justifying its decision to offer parties an opportunity to respond, the Commission referred to the possibility that its treatment of the issue "would have benefitted from allowing participants a further opportunity to *comment*." PRC Further Rec.Dec. app. I at 41 (emphasis added). Similarly, the Commission explained that if participants indicated they had *"testimony to present,"* it would "attempt to expedite this process, although we recognize that participants will need some time to prepare *submissions."* *Id.* at 41–42 (emphasis added). We think it at least reasonable for the petitioners to have understood this language as not giving them the opportunity to do anything other than simply present testimony—an opportunity inadequate to satisfy the Act's requirements.

For the preceding reasons, we remand the city carrier access cost attribution for the Commission either to recalculate methodologies and figures grounded in the record or, if it wishes to use different ones, to conduct a new hearing on the record in accordance with sections 556 and 557 of the APA.

## IV. Third Class Bulk Nonprofit Presort Discounts

We next address the Commission's recommended rates for third-class bulk nonprofit mail, which is the subclass of third-class mail reserved for charities, churches, educational institutions, and other qualified nonprofit organizations.

A large portion of Postal Service operating costs is attributable to the process of sorting mail. Thus, the Service offers discounts for various levels of presorting as an incentive to mailers to presort their mail if they can do so more efficiently than the Service. All third-class bulk mail must receive at least a minimum level of presorting. Beyond the minimum, presorting discounts are available under the new rate structure for—in order of

---

**23.** In response to the first recommended decision, at least one of the petitioners, Mail Order Association of America, cited the need for "presentation of testimony by witnesses subject to interrogation and rebuttal" and "discovery and cross-examination." J.A. Vol. IV at 1193–93A.

increasing discount level—(1) pieces addressed to the same 3–digit ZIP code prefix or 5–digit ZIP code ("3/5" presorting); (2) pieces directed to the same carrier route, post office box section, or general delivery unit ("CR" presorting); and (3) mail presorted by carrier route and addressed to at least 90% of the addresses on the route ("saturation" mail).

Over the past decade, the USPS has followed an explicit policy of gradually increasing the percentage of the Post Office's presorting savings that is passed through to mailers. It and the Commission have recognized that a full "presort passthrough" is efficient in that it encourages mailers to choose the least costly combination of presorting and USPS processing. *See* PRC Op. at V–232–33; Testimony of USPS Witness Mitchell, J.A. Vol. II at 452–56. Thus, with Commission approval, the Service in 1984 increased the presort discounts to about 80% of the cost savings, and in 1988 to about 90%; there they stood when the Service initiated Docket R90–1.

In R90–1 the USPS proposed a "shape differential" for the rates, recognizing differences in the costs of processing letter-sized mail [24] and all other shapes, known as "flats." Although letters are less costly to process than flats, the rates had not reflected this disparity until R90–1. The USPS proposed a modest "deaveraging" for bulk nonprofit mail—adjusting rates as between letters and flats so as to reflect about 25% of the cost difference.

In considering this proposal, the Commission noted that the cost difference between letters and flats decreases as the level of presorting increases; for example, the cost difference between flats and letters presorted only to the required level, 6.27 cents per piece, is much greater than that between flats and letters at the saturation level, 2.52 cents per piece. Thus, even a 25% "shape differential passthrough" would result in a 49% increase in the "base" rate for flats (i.e., the rate for flats presorted only to the minimum level); the Commission regarded any

greater increase as undesirably large. At the same time, it noted that a shape differential passthrough of less than 25% would interfere with the goal of "recogniz[ing] cost-driving factors in the rate structure" in order to provide the proper incentives to mailers. *See* PRC Op. at V–313. The Commission therefore accepted the USPS proposal for a 25% "shape differential" passthrough.

The Commission then addressed the interaction between the newly-adopted shape differential and existing discounts for presorting. Although the Commission's opinion describes this issue only in broad terms, *id.* at V–313–14, the record reveals the problem in more detail. *See* Testimony of Witness Haldi, J.A. Vol. III at 663. The combination of even a 25% recognition of shape differentials, plus a high presort passthrough rate, would result in extremely large rate increases for certain classes of mail—especially coarsely presorted flats. With the 25% shape differential, the proposed rate for coarsely presorted flats—12.5 cents per piece—represented a 49% increase over the prior rate. Yet reduction of that rate by the full amount of savings attributable to the various levels of presorting (4.43 cents plus 5.64 cents plus 2.51 cents) would have lowered the rate for saturation flats to less than zero. (Because of the limited nature of the shape-differential passthrough, the charges for third-class *letters* would cover the resulting revenue shortfall.) Accordingly, preservation of the 90% presort passthrough would require either bizarrely low rates for finely sorted flats or more than a 49% increase in the base rate for flats. As a way out of this dilemma, the USPS proposed that the presort passthrough be reduced from 90%.

The Commission recognized that such a reduction "differ[ed] sharply from that of the past" and emphasized that the policies in favor of higher presort passthrough rates "[i]n theory ... are those we believe should continue to apply." PRC Op. at V–313–14. But it concluded that maintaining or increasing presort passthrough rates would produce unacceptably high rate increases. *Id.* at V–

---

**24.** Postal regulations define letter-sized mail to be between 5 and 11½ inches long, 3½ and 6⅛ inches wide, and .007 and ¼ inch thick.

314. Thus, the Commission adopted (with minor modifications) the USPS's proposed rate schedule for bulk nonprofit mail, with presort passthrough rates ranging from 21% for letters presorted to the saturation level to 70% for letters presorted to the CR level. The Commission rejected an alternative proposal presented by the Alliance of Nonprofit Mailers ("ANM"), characterized primarily by a lower passthrough of the shape-based cost differential (15% as opposed to the USPS's 25%) and a slightly larger range of presort passthrough rates (21% for letters presorted to the saturation level to 100% for letters presorted to the 3/5 and CR levels).

 ANM challenges the Postal Service's order adopting the Commission's recommendation. It initially raises a number of arguments targeting the Commission's decision to depart from its former policy of high-level presort passthroughs, asserting, for example, that lowering presort passthrough rates from their prior level is unfair and economically inefficient. Whatever the merits of these arguments, they are not properly before us. Far from presenting them to the Commission, ANM there presented a quite inconsistent view. *See, e.g., Mitchell v. Christopher,* 996 F.2d 375, 378 (D.C.Cir.1993) (court does not consider position not presented to agency); *Washington Ass'n for Television & Children v. FCC,* 712 F.2d 677, 680 (D.C.Cir. 1983) (same). There ANM's primary witness ultimately conceded that 100% (or even 90%) presort passthrough for all bulk nonprofit letters and flats would result in "undesirably large" rate increases for certain mail categories, and agreed with the USPS that "unduly large rate increases should be avoided." Testimony of Witness Haldi, J.A. Vol. III at 663. ANM recognized that "non-efficiency concerns (including concerns of avoiding rate shock or undue economic dislocation from rapid rate changes) may sometimes warrant departure from rate levels indicated solely by principles of economic efficiency." *Id.* at 659. Thus, it proposed a passthrough rate of 100% in only two categories, and a range of 21% to 65% (with no passthrough rate higher than 65% for flats) in the other four categories, in order to "keep overall rate increases within manageable levels." *Id.* at 665–66.

Of course, nothing precluded ANM from taking alternative positions before the Commission—for example, arguing for 100% passthrough, with the proposal it actually presented as an alternative or backup. But this is not what ANM did, and it cannot now be heard to argue that the Commission erred in failing to adopt full or near-full presort passthrough when the very points it raises to support this argument can be applied to its own proposal.

 ANM's other attack on the Commission's recommendations is one it is plainly entitled to raise—a contention that the Commission wrongly rejected ANM's proposed rates in favor of the Postal Service's. Here ANM points to undisputed testimony in the record that, under standard statistical measures of variance, ANM's proposed rates for both letters and flats deviated less from actual costs than did the USPS proposals. *See* J.A. Vol. III at 693–95. The Commission is directed by the statute, however, to consider factors other than cost, *see* 39 U.S.C. § 3622(b), quoted *supra* at 415, and we find that its rejection of ANM's proposal in reliance on those factors was not arbitrary or capricious.

One reason proffered by the Commission to justify its rejection of ANM's proposal was that it resulted in an "unacceptably wide" range of rate changes. *See* PRC Op. at V–316–18. It noted that ANM's proposed rates would result in a 32% decrease in the rates for saturation letters entered at a delivery unit and a 66% increase for 4-ounce flats presorted to the required level, and stated that "[w]e believe this range [98%] produces undesirable results." *Id.* at V–318. Nowhere did the Commission explain *why* a large range of changes is undesirable or unfair, however. Apart from harm to mailers at the high end of the range—seemingly a completely separate issue—it is hard to see any problem with a large range. When pressed at oral argument, counsel for USPS could only offer the jealousy that mail users at the high end of the range might feel toward ones at the low end. Although such jealousy might as a matter of pure language be considered an aspect of "fairness" (which the Commission is entitled to consider under

39 U.S.C. § 3622(b)(1)), the results of such a view are truly startling. If that reading of § 3622(b)(1) were accepted, the Commission might reject a set of rates corresponding closely to cost, but involving a range (of change from prior rates) of −50% to +5%, in favor of rates corresponding less well with cost but with a range of −20% to +10%, even if the rates involving the broader spread of increases involved no abrupt competitive impact. Neither the Commission nor the Postal Service offers any indication from the legislative history that Congress intended any such reasoning. Thus, if the Commission had relied solely on the spread, we would in these circumstances be required to remand for further consideration.[25]

In fact, however, the Commission rested its rejection of ANM's proposed rates on other concerns. First, it objected to ANM's very limited recognition of the shape differential. ANM's rates would have reduced the USPS's proposed 1.5 cent rate difference between the base rates for letters and flats, which reflected 25% of the cost difference, to a 1 cent rate difference, which would have reflected only 15%. The Commission decided that 25% was a "moderate" level of recognition and that "further reduction would interfere with the need to begin to recognize cost-driving factors in the rate structure to a meaningful degree." PRC Op. at V–231, V–313. As between ANM's and the Postal Service's proposals, the trade-off was thus between closer proximity to cost in some aggregate sense and closer proximity as to the new shape differential. In the absence of some quantification showing that the trade-off was unreasonable, or some evidence that conformity to cost was for some reason of less importance for shape differentials, we can see no reason why we should second-guess the Commission on the point.

Further, the Commission repeatedly alluded to the problem of "rate shock," or unduly large and sudden increases for certain mail categories. See, e.g., id. at V–250, V–314, V–316. The largest rate increase in ANM's proposal (for pieces less than four ounces and without regard to other discounts, such as automation or destination entry discounts, which affect both proposals equally) was 60% for the base flat rate. See id. at V–317; J.A. Vol. III at 671. The largest increase in the USPS proposal was 51% for flats presorted to the CR level. See PRC Op. at V–171; J.A. Vol. III at 656. The Act allows the Commission to consider the effect of rate changes upon Postal Service users when setting rates, 39 U.S.C. § 3622(b)(4), and although this 9% difference is not huge, the Commission was entitled to weigh it against the advantages of ANM's proposals.

ANM, however, points to a report to Congress issued by the Commission six months after its January 1991 recommendation as evidence that the Commission was disingenuous in claiming to be concerned about avoiding drastic rate increases for flats. Report to the Congress: Third–Class Nonprofit Mail Study (issued July 8, 1991) (J.Add. at 126–82). In the report, issued in response to a congressional request for a proposal to reduce the costs of bulk nonprofit mail, the Commission recommended that Congress eliminate all congressional subsidy for the additional cost of flats above and beyond the cost of letters. This proposal, which was eventually adopted, resulted in a decrease in the flat subsidy—i.e., an across-the-board increase in the flat rate—of 4 cents per piece. (Because the increase was across the board, it had no effect on the presort discounts and does not moot ANM's challenge.) The report contained a number of statements that could possibly undermine the Commission's conclusion that drastic rate increases for flats are undesirable, including assertions that many catalogs can be reformatted to letter size and that increasing the cost of flats would "foster automation by encouraging mailers to use letter-shaped mail pieces." J.Add. 14–15.

*Walter O. Boswell Memorial Hosp. v. Heckler,* 749 F.2d 788 (D.C.Cir.1984), appears to bar our reliance on this report in evaluating whether the Commission's decisionmaking was reasoned. There we reject-

---

**25.** Because we reject the Commission's reliance on the spread of rate increases to justify its rejection of ANM's proposal, we do not reach the numerous arguments ANM advances objecting to the Commission's method of calculating the spread.

ed efforts by the *amicus* to submit affidavits summarizing a study performed *after* the agency published the final rule, explaining that in review of an agency decision the record must be limited to "that information before the [agency] *at the time of [its] decision,* ... thus excluding *ex post* supplementation of the record by either side." *Id.* at 793. This makes sense; it does not follow from an agency shift in position *after* the decision under review that there was anything unreasoned about the earlier position. *Altamont Gas Transmission Co. v. FERC,* 965 F.2d 1098, 1101–02 (D.C.Cir.1992) (citing cases). It seems especially so here, where the difference in context—a report to Congress, rather than an application of a statute—might well explain apparent inconsistencies.

To undermine the apparent impact of *Boswell,* ANM cites *Chicago Mercantile Exchange v. SEC,* 883 F.2d 537 (7th Cir.1989), *cert. denied sub nom. Investment Co. Inst. v. SEC,* 496 U.S. 936, 110 S.Ct. 3214, 110 L.Ed.2d 662 (1990), where the court said that it could consider a report an agency had submitted to a Senate committee after the disputed decision. The report was "a public document, which the court would be free to consult whether or not anyone had supplied it; lodging simply reduces the workload of the court's librarian." *Id.* at 541–42. The court never again referred to the report, however, and did not identify any specific purpose for which it might be used. As the court simply declared that it was "free to consult" the report, as if it were in the court library, it may have meant no more than that it could read the report as it might read *anything* for purposes of ascertaining "legislative" facts. *See* Federal Rule of Evidence 201(a), Notes of Advisory Committee on 1972 Proposed Rules. Accordingly, we do not see *Chicago Mercantile Exchange* as presenting any reason to qualify the holding in *Boswell,* much less to overturn it—which as a panel we have no power to do.

■ When an agency relies on multiple grounds for its decision, some of which are invalid, we may nonetheless sustain the decision as long as one is valid and "the agency would clearly have acted on that ground even

if the other were unavailable." *Syracuse Peace Council v. FCC,* 867 F.2d 654, 657 (D.C.Cir.1989), *cert. denied,* 493 U.S. 1019, 110 S.Ct. 717, 107 L.Ed.2d 737 (1990); *Salt River Project Agricultural Improvement and Power District v. United States,* 762 F.2d 1053, 1061 n. 8 (D.C.Cir.1985). As the record in this case strongly suggests that the Commission would have preferred the USPS proposal to ANM's even without regard to its concern about the range of rate changes, and in light of the Commission's wide discretion to consider factors other than cost in ratemaking, we uphold the Commission's recommendation as adopted by the USPS.

## V. Zoned Rates for Second-Class Editorial Matter

■ Dow Jones & Co. and Time Warner (hereinafter collectively "Dow Jones") challenge the Commission's decision not to adopt a zoned postage rate for the editorial content of second class mail. Second class mail comprises periodicals and is divided into four subclasses; only the rates for regular second class mail are at issue here. These rates have two components: a "per-piece" charge, which as its name suggests is a flat charge per piece of mail, and a "per pound" charge, which varies with the weight of the mail. The per-pound charge is in turn divided into two parts—advertising content and editorial content—which are charged at different rates.

The advertising pound charge varies with the number of postal "zones" through which the matter is mailed. Thus, the farther the destination from the point of mailing, the higher the charge, until the distance reaches "Zone 8," which generally includes all areas more than 1800 miles from the sender's post office. The editorial pound charge ("EPC"), on the other hand, has always been, even since before the passage of the Act, unzoned and so does not vary with the distance travelled.

The USPS proposed in Docket R90–1, for the third time since 1977, that the EPC be zoned. The Commission had rejected similar proposals in 1977 (U.S. Postal Rate Commission Postal Rate and Fee Increases 1977, Opinion and Recommended Decision at 344–

51 [hereinafter Docket R77–1]) and 1987 (U.S. Postal Rate Commission Postal Rate and Fee Changes 1987, Opinion and Recommended Decision at 546–50 [hereinafter Docket R87–1]), and did so again here for identical reasons. The Commission framed the question as a choice between what it viewed as "economic" considerations on one hand and "public policy" considerations on the other. PRC Op. at V–119. In favor of zoning, the USPS argued that a zoned EPC would send the proper economic signals and avoid discrimination against "short-haul" publishers and "cross-subsidization" of "long-haul" publishers by short-haul ones. Joining the Postal Service in this argument were Dow Jones and other short-haul publishers of large-volume periodicals (such as *Time*), who bypass the need for long-haul mail transportation by using satellite transmission to print at multiple printing plants and then depositing the periodicals at postal facilities for short-distance travel.

On the other side, various groups, including the American Business Press (ABP), the Coalition of Religious Press Associations (CRPA), McGraw Hill, and the Shorter–Run Printers Committee (SRPC) (all intervenors here), argued that the unzoned system was consistent with congressional intent to encourage the "widespread dissemination" of editorial matter, as well as the statutory requirement that the Commission take into account "the educational, cultural, scientific, and informational value to the recipient" of mail matter. *See* 39 U.S.C. § 3622(b)(8).

The Commission decided against zoning, saying that special treatment of editorial matter in order to encourage "widespread dissemination of information" (a term that does not appear in the Act) is consistent with § 101(a) of the Act, which states that the basic function of the USPS is to provide services to "bind the Nation together"; with § 3622(b)(8); and with the pre-Act history of congressional second-class rate setting. PRC Op. at V–121.

Dow Jones questions whether this asserted rationale supports rejection of a zoned EPC.

It argues that the goal of fostering "widespread dissemination" does not justify rates that are economically inefficient, unduly discriminatory against short-haul publishers in violation of 39 U.S.C. § 403(c),[26] and at odds with the concern for cost recovery expressed in 39 U.S.C. § 3622(b)(3). That section requires each "class of mail or type of mail service" to "bear the direct and indirect postal costs attributable to that class or type," plus a portion of institutional costs.

Dow Jones does not claim a direct violation of 39 U.S.C. § 3622(b)(3). A zone, such as those established for purposes of the editorial pound charge, is neither a "class" of mail nor a "type of mail service," nor even a "subclass," and Dow Jones makes no claim that the Commission should have designated the zones as such. Compare *Newsweek*, 663 F.2d at 1209–10 (rejecting a claim that Commission should have established presorted mail as a subclass). Its argument is a two-step claim that the refusal to zone is "at odds" with § 3622(b)(3). First, when distance-related costs are taken into account, Dow Jones argues that it is evident that long-distance second-class mail as a whole is not bearing its full share of attributable costs. Indeed, Dow Jones offers figures suggesting that this is true, and we will assume that it is.

Second, Dow Jones argues that since the Postal Service does divide second-class mail into zones for purposes of the advertising charge, the Commission cannot justify non-zoning on grounds of practicality or infeasibility. *Cf.* § 3622(b)(7) (directing Commission to consider "simplicity of structure for the entire schedule"). The complexity is already there.

Thus the case is not governed by the strict "requirement" of § 3622(b)(3) that "class" or "type" must bear its attributable costs. *Cf. National Ass'n of Greeting Card Pubs.*, 462 U.S. at 820, 103 S.Ct. at 2725. The question then, is whether the Commission was arbitrary in its ultimate trade-off between the cost considerations that pointed toward zoning, and the competing values that it ulti-

---

26. This section prohibits the Postal Service in establishing rates from "mak[ing] any undue or unreasonable discrimination among users of the mails, nor shall it grant any undue or unreasonable preferences to any such user."

mately favored. Any such arbitrariness would presumably violate 39 U.S.C. § 403(c)'s prohibition of "undue or unreasonable preferences."

The refusal to zone indeed appears unsupported by any cost principle—fully allocated, marginal, incremental, etc. Such a divergence from cost, Dow Jones argues, dilutes the incentives for long-haul publishers to engage in practices that would save the Postal Service money, such as "dropshipping" near the mail's destination. As we noted in connection with presorting discounts and shape differentials, divergence from cost tends to send users inaccurate signals—ones that may lead mailers to adopt distribution strategies that are more costly than necessary. *See supra* at 431. Furthermore, unzoned rates could harm the Service by encouraging high-volume mailers capable of dropshipping to shift their business away from the Postal Service altogether.

Indeed, the Commission did not dispute the economic arguments in favor of a zoned EPC. Rather, it decided that the so-called public policy considerations outweighed them. Our review is limited to determining whether there is anything arbitrary or capricious in its choice. The Commission's recommendation is rather summary, but does refer to its earlier rejections of a zoned EPC, in which it set forth its reasoning more thoroughly. *See* PRC Op. at V–118, 119 (citing Docket R87–1, *supra,* and referring to previous rejections of the zoned EPC). The Commission appears to have relied primarily upon two provisions of the Act in determining that the goal of fostering "widespread dissemination of information" justified rejection of a zoned EPC.

The first of these is 39 U.S.C. § 3622(b)(8), which allows the Commission to consider "the educational, cultural, scientific, and informational value to the recipient of mail matter" when setting rates. The Commission argued that this provision, which was added to the Act in 1976, "reinforces the special nature of the editorial content of second-class mail and requires special treatment of such." PRC Op. at V–121. The trouble with the argument is that both the advantaged and the *dis*advantaged publications supply these informational benefits. The

Commission gave no reason why it considered the educational, cultural, scientific, and informational value of local publications such as *The Washingtonian,* or dropshipped publications such as *Time,* to be less than that of long-haul publications such as *The New Republic;* any reading of the statute that authorized the Commission to make such judgments would run into constitutional heavy weather, as the First Amendment limits the content-based distinctions that the government may make even in a proprietary capacity, *see, e.g., Rankin v. McPherson,* 483 U.S. 378, 390–92, 107 S.Ct. 2891, 2900–01, 97 L.Ed.2d 315 (1987) (government as employer), and in any event the Commission does not even claim to have made such evaluations. Once we recognize that education, information, etc. are on both sides of the trade-off, the argument lends no support to the Commission's outcome. In fact, the generic interest in spreading information may cut the other way. Because the divergence from cost principles has the probable tendency of increasing overall costs of distribution, and thereby reducing the market-clearing level of distribution, it may diminish the flow of information.

The Commission also relied upon 39 U.S.C. § 101(a)'s mandate that the USPS "bind the nation together through the personal, educational, literary and business correspondence of the people." This rather broad anti-Balkanization principle supports the view that the Service is entitled to enhance "widespread dissemination of information," not in the sense of increasing the "units of information" mailed, but in the sense of increasing the *nationwide* distribution of units of information. Numerous witnesses testified before the Commission that a zoned EPC would threaten the existence of nationwide publications with low circulation and low advertising revenues, such as *Public Utilities Fortnightly, Neurology,* and *ID Systems* (a journal relating to barcoding and similar computer systems). *See, e.g.,* testimony of ABP witness McInnis, J.A. Vol. III at 638–39; ABP witness Dolobois, *id.* at 634–37; ABP witness Helmers, *id.* at 834–35. Indeed, in the 1977 rate proceeding the Commission stated that "what shifts the balance

decisively against [a zoned EPC] ... is the prospect of detrimental impact upon small publications which are mailed to the distant zones." Docket R77–1, *supra*, at 350. By raising the cost of sending such periodicals across the nation to potentially prohibitive levels, a zoned EPC would interfere with long-distance transmission of information and therefore could be viewed as inconsistent with the congressional purpose of "binding the nation" together. That is a value that Congress favored strongly—to the point of mandating nonzoning for first-class mail. *See* 39 U.S.C. § 3623(d). Thus, in light of § 101(a), we have no basis for calling arbitrary and capricious the Commission's decision to adopt a rate structure favoring mailers who send their publications long distances. *See Association of American Publishers*, 485 F.2d at 774–75. Furthermore, because it seems clear that the Commission would have reached the same result under § 101(a) even without considering § 3622(b)(8), we sustain its decision rather than remanding. *See Syracuse Peace Council* and *Salt River Project, supra*.

## VI. Non–Transported Mail Classification

■ Niagara Telephone Co., a local telephone company located in the town of Niagara, Wisconsin, challenges the Commission's rejection of its proposal to adopt a separate mail classification for "non-transported mail," which it defines as "metered mail delivered by the customer to a post office which ... is then placed by the receiving post office into an on-premises post box for pick-up by the addressee." Niagara deposits its metered telephone bills at its post office, and, according to Niagara's manager, the bills are then placed in post office boxes on the same premises without ever leaving the premises. Nonetheless, this mail is charged the same rate as a normal, "transported" first class letter.

Niagara alleged before the Commission that charging non-transported mail the standard first class rate is unfair and discriminatory because it fails to take into account the lower costs of processing such mail—for example, it is sorted only once and incurs no transportation costs. Thus, says Niagara, the rate improperly results in the "subsidization" of transported by non-transported mail

in violation of 39 U.S.C. § 3622(b)(3). Niagara proposed a separate classification and discounted rate for non-transported mail.

The Commission rejected this proposal, accepting the USPS's conclusion that the proposal was based on "obsolete operating patterns." The Commission found that under present-day Postal Service operations, even if a piece of mail is addressed to a box at the post office at which it is deposited, processing of the mail may occur at a distant location. PRC Op. at V–92. Therefore, any discount for this mail would be based on the potentially incorrect assumption that the mail would not undergo certain processing which it might in fact undergo and thus would not accurately reflect attributable costs. This analysis plainly reflects an inaccurate assumption that Niagara's proposal was addressed to all mail that merely *appears* superficially to involve no transportation and fewer sortation costs, while in fact it was limited to ones where that appearance was accurate. Finally, the Commission said there was no evidence in the record showing that transportation and sortation costs "would actually be saved in the manner [Niagara] postulates," *id.*, or justifying application of the discount to metered, but not stamped, mail (as Niagara had proposed). *Id.*

Niagara understandably objects that the Commission's response was directed at a proposal different from the one the company actually made. The point is technically correct, but we think the Commission's answer comprised a broader point. Even if some mail, including Niagara's, is non-transported, this alone would not justify the creation of a separate classification for such mail. The apparent obsolescence of this operational pattern, and Niagara's failure to point to any other volumes of non-transported mail besides its own, undermined the case for establishing a separate category. Even though 39 U.S.C. § 3622(b)(3) requires each "class of mail or type of mail service" to recover its attributable costs, that section does not require creation of a separate class of mail for every single cost characteristic. As we noted before, § 3622(b)(7) allows the Commission to consider the simplicity of the rate structure, and a separate rate for every group of mailers with special cost savings, no matter

how small the group, would produce a hopelessly complicated rate schedule. This does not mean the Commission may always reject proposed cost-based classifications in order to avoid complexity in the rate schedule; in some cases the facts might be compelling enough to require a new classification. Here, however, given the complete absence of evidence establishing the existence of a substantial category of mail systemically involving lower costs, the Commission's rejection of Niagara's proposal was not arbitrary or a violation of § 3622(b)(3).

We note that 39 U.S.C. § 3623(d) requires that "classes of mail for the transmissions of letters sealed against inspection" have a rate that is "uniform throughout the United States, its territories, and possessions." The Commission did not list this among its reasons for rejecting Niagara's proposal. Thus, although the USPS alluded to the argument in its brief, we do not address it here.

\*　　\*　　\*

For the preceding reasons we remand the case to the Commission for further consideration of its PAR recommendation and its city carrier cost attribution. In all other respects, the petitions for review are denied.

*So ordered.*